Good morning. May it please the court. The case that we're about to discuss arises from an altercation between Albert Ramos and several Houston Police Department officers, which ultimately resulted in his conviction for harassing a public servant by spitting on Officer Gilbreth. I wanted to start the discussion to ground the court because the trial court did grant the officers 12 v. 6 motions in part. So the only claims that are pending right now that we have brought up here are for Officers Erwin and Gilbreth. There is a claim for false arrest, an excessive force that stems from the initial tackle of Mr. Ramos. As to Officers Dago, Smith, and Morrison, the only claim remaining against them is an excessive force claim stemming from the use of foot restraints, which Ramos describes as hog tying. For purposes of my remarks today, I wanted to start with the false arrest claim and then discuss the two excessive force claims in sequence. I wasn't planning to discuss HECBAR. That's in our briefing. But I wasn't planning to talk about that unless the court has particular questions. So to start with the false arrest... I want to hear what you have to say, but just to understand, essentially are we bound to the allegations in the complaint since we're at a motion to dismiss? So we have to accept those as true. Is that right or am I wrong about that? It's true, sort of, because in addition to the four corners of the complaint, our 12b6s attached the indictments for Mr. Ramos, the magistrate's probable cause findings, and as well as the conviction for the assaulting or harassing a public servant. So you can consider those. The trial court did consider those as well. And on top of that, there is a bit of tension on 12b6 for qualified immunity because you do have to consider the well-pleaded allegations, but for qualified immunity, it has to be judged from the perspective of the officer. So when you're construing the facts in plaintiff's favor, that only goes so far as to what the officers can reasonably perceive from their perspective based upon these allegations. Does that make sense? This is one of those unique cases where we have no video, we have no dash cam, we have no belt cam, we have no cam period, right? So subject to what you just said about the paper, I mean, nobody's got a dash cam, a belt, there's no citizen with a cell phone. I mean, so often in these cases, somebody spots something and then we're into the world of, well, the video sort of prevails. But here, it's what the judge had was what you just described. Is that right? It's sort of conflicting. Some judges will only consider the video if the plaintiff attaches it. In some cases, some judges won't consider it because documents attached to the pleadings are only things such as contracts. That's a position Judge Hittner has taken in one of his memorandum opinions. So we're always faced with the dilemma in these cases. Well, I was just trying to be within the parameters of the question, Judge Nugent. I was just trying to, is there such? There is. I mean, it's too quick. You can tell me there is one, but Judge Ellison didn't allow. Well, that's sort of a different thought. I just assumed, quote, there wasn't one, and that's what you just answered is kind of a parameter. Yes. There is not one on this record. We did not attach it. Okay. So I did want to start with the Espinal opinion because it did come out of the Fifth Circuit this year. City of Houston v. Espinal, and for a false arrest claim, the court noted that the essential element is the lack of probable cause. And once a suspect is indicted, that's where we start and end our analysis. And we know from this record there were six probable cause findings to support Mr. Ramos' arrest. The day after he was taken into custody, he was put before a magistrate. Jim Callen found probable cause for three counts, two counts of kicking police officers and then the one count for spitting on Officer Gilbreth. But he argues that he was arrested once he was tackled, not when other things happened. Right. And that's probably a bit too generous to Mr. Ramos because when the Supreme Court has held that simply putting someone in handcuffs, even if you have to use force to do it, doesn't automatically turn into an arrest. We're still looking, based on his pleadings, at this being a Terry investigative stop because the facts that were pled is we have a 911 call. Officer Irwin is responding to that. He sees some witnesses. Witnesses flag him down. And then when he finds Officer Ramos, he rolls down his window in the March Cruiser and says, hey, do you want to give me your side of the story, man? And Ramos doesn't comply. He doesn't stop. He keeps walking. That's in the complaint. He did reply to the extent that he's saying, what are you talking about? He didn't reply. Now, what Ramos put in his complaint is that he didn't comply because he didn't understand. But again, this is qualified immunity. We don't have any explanation for what Irwin was exposed to other than he asked Ramos to tell his side of the story and Ramos didn't. Whether it was because Ramos was confused or didn't understand, that's not something that Irwin would have known. And that's a fact that Ramos tends to ignore in his appellate briefing. I mean, this is just a factual question. I can, of course, look at the complaint. But is it not the case that Ramos replied he didn't know what story Irwin was talking about after Irwin said, what's your side of the story? I don't think he did. If you look at the record on page 12, Irwin asked him to tell his side of the story and Ramos doesn't comply because he doesn't understand. But the reason he does not comply is not relevant to qualified immunity. All we know is that Irwin sees a shirtless suspect in the general area of Montrose in the wee hours of the morning who's not complying with his request to tell his side of the story. Is there anything in the complaint that reflects the proximity? There was a 9-1-1 call about someone who was drunk, alleged assault, a Hispanic man. Is there anything that reflects the proximity, either in time or distance, between that 9-1-1 call, like where it was directed, and this interaction between the officer and Ramos? Yes. I think we can conclude from the complaint that because there were witnesses still on scene who said, yeah, they were just arguing, and then Ramos is on foot. Keep that in mind. He couldn't have gone very far. The time period of a car versus a pedestrian, it's not going to match up. So I think from that we can reasonably conclude it was a very close proximity in time. On top of that, these are the facts in the complaint. There are other facts in the probable cause findings for the magistrate count. Bail or bond was denied or recommended to be denied in part because when Irwin first arrived on the scene and Ramos saw the marked vehicle, Ramos broke into his front and ran away. So then when Irwin then caught up with him, that's when we have the discussion of, hey, man, tell your side of the story. Let's look at Judge Ellison's memorandum in order. He says, I'm just quoting here a few lines, when Irwin saw Ramos, a Hispanic man, walking on a public sidewalk by himself, he drove next to Ramos and asked him to tell, quote, his side of the story, close quote. Ramos was confused as he had just enjoyed a night out dancing with his sisters. Irwin then got out of his police vehicle and ordered Ramos to stop moving away from him. Ramos complied with the order and stopped moving. And then Irwin, quote, suddenly grabbed Ramos' arm and began tackling him to the ground, close quote. What part of those statements, recitations by Judge Ellison do you disagree with? Well, it ignores the fact that he was just a Hispanic male in that part of town. Plaintiff also pled that he was drunk. And the witnesses who reported the assault to 911 reported that it was a drunken altercation between multiple people. So while Judge Ellison was viewing the facts in plaintiff's favor, his characterization of the facts in the petition went a little bit too far and too favorable and ignored some of the record facts. That just sounds like we're arguing at Rule 56 level. It's just sort of getting twisted. I mean, it's sounding like summary judgment stuff. Hold it. Because, you know, it started with the premise it's on a motion to dismiss. Well, it can't be both that you read the facts, you know, as pled, but, you know, you look at this, you look at that, you look at this, and now we're talking about what witnesses saw, what witnesses said. Then you're quarreling what the judge's findings. I mean, that's beyond looking at the four corners of the complaint. And so, I mean, it may be a persuasive argument on why qualified immunity should be issued after summary judgment or at some other point. But the lines are getting a little blurred. And part of the pushback on the other side in the briefing is to say that your argument was counter facts to what the district court located. So just scroll back and within the premise you said with the complaint and with those things that are there in terms of how you're responding to the question of what you differ. It just sounds like, you know, there was a Rule 56 proceeding and you differ with that. Well, and that's, I think, why I started with Espinal. Because the indictments cut off the false arrest claim. And that's kind of where we are. We don't need to get in the weeds about what the judge found persuasive or not in the complaint. Remind me, what was he indicted for? He was indicted on two counts of kicking a police officer and then one count for harassing a public servant through contact with saliva, so spitting on her. Okay, my reaction to that is those actions occurred after the original encounter and so they wouldn't cut off a false arrest claim. Do you disagree with that? I do disagree with that. Because under Espinal, if you have probable cause finding after the arrest, if probable cause didn't exist at the time, but there is ultimately an indictment that still the independent intermediary cuts the chain of causation. So probable cause findings that, you know, you have the magistrate, that occurred after in time. And under this court's precedent, that still cuts off the chain even if it's not done before the arrest. If there is a single probable cause finding, that's all we need is one. And that eliminates the ability for a plaintiff to bring in a false arrest claim. Because if there is probable cause for a single charge, then there was probable cause for the arrest as a whole. So I want to, I only have two minutes left, so I did want to briefly touch on the excessive force claims. And for both of them, the problem that Ramos suffers from is that we've got a single vague set of injuries and two different theories of excessive force. And the injuries amount to bruising. Severe bruising, but bruising nonetheless, combined with mental anguish essentially. And this court's precedent has set forth clearly that you've got to have more than a de minimis injury to have a Fourth Amendment excessive force claim. Because reasonable force will really only lead you to some de minimis injuries, if any at all. And bruising can't be transmutated into an excessive force claim merely by tacking on mental anguish. And what we, for the tackling claim, there were really no damages or injuries pled from that act. There is no set of bruising or, you know, there was no suggestion that there was a cracked rib or a skull fracture. There's nothing like that. The only injuries alleged were associated with the hog tying, and still you're looking at bruising. Now, the district court's memorandum opinion said, well, he was screaming in pain. But as we put in our reply brief, screaming is not an injury. Screaming is just screaming. And he was doing these things in equal measure before he was even subjected to the foot restraints. So we've got nothing more than de minimis injuries here that can't support an excessive force claim for either the tackling or the hog tying. I think my time is up. Thank you. You saved time for a bottle, Ms. Martin. Yes, I did. Thank you. Ms. Duggins? May it please the court? I am Kia Duggins, counsel for Plaintiff Appellee Alberto Ramos. Mr. Ramos is here in the courtroom with us today. And we are here advocating for this court to uphold Judge Ellison's well-reasoned decision, which found that Mr. Ramos's case should not be dismissed under Federal Rule of Civil Procedure 12b-6, because Mr. Ramos has plausibly alleged that defendant appellants tackled and arrested him solely based on his Hispanic race and male sex, and then gratuitously hog tied him. Over the last 25 years, this court has held multiple times that hog tying a medically vulnerable person who is already physically subdued by the officers violates clearly established law. In considering a motion to dismiss for failure to state a claim, a court must limit itself to the contents of the plaintiff's pleadings and view those pleadings in the light most favorable to the plaintiff. Counsel, do you agree with Ms. Martin that we can consider the complaint as well as some other documents, or do you disagree with that? I disagree with that, because in Collins v. Morgan Stanley Dean Whitaker, this court found the court must limit itself to the plaintiff's pleadings. Sometimes we can look at things that are attached. I'm just not sure in this case. So we do disagree with that assertion. However, the attachments that the appellants included, the probable cause statements, confirm the factual timeline that Mr. Ramos pleaded. Okay. Judge Ellison properly applied Rule 12b-6 by construing the facts in the light most favorable to Mr. Ramos and refusing to accept the counter narratives that defendant appellants raise and that undergird most of the defendant appellants' arguments. This court should do the same. Specifically, defendant appellants counter Mr. Ramos' complaint and counter Mr. Ramos' factual allegations that he displayed no suspicious, violent, or oppositional behavior before defendants tackled, handcuffed, and sat on top of him. Is your view that he was arrested at the moment he was tackled? Yes, Your Honor. The moment that defendants Irwin and Gilbreth tackled him and placed handcuffs on him. Okay. I guess my question was, should there be any different analysis with respect to the two officers? Because I think we have cases that say you have to do an independent analysis for each officer. So who tackled him according to the complaint? According to the complaint, both Irwin and Gilbreth tackled him. Oh, at the same time? Yes. Gilbreth arrived on the scene a few seconds after defendant Irwin did, and then both appellants tackled Mr. Ramos. Okay. So you're saying, if I look at the allegations of the complaint, this happened simultaneously. So you're saying there wouldn't be a different analysis as to the two officers? There would not. For false arrest claim? For false arrest. No, there would not be a different analysis. And in fact, although defendant Irwin arrived to the scene first, defendant Gilbreth arrived a few seconds later, helped defendant Irwin tackle Mr. Ramos to the ground, and then defendant Gilbreth sat on top of Mr. Ramos as they handcuffed Mr. Ramos. I guess the reason I ask is because I can imagine a situation where one officer does something that might constitute false arrest, but then the second officer gets there and sort of has to accept the situation as she finds it, and maybe there's a different analysis for her. I don't know if that's the case here. No, Your Honor. I would say that, again, defendant Gilbreth arrived a few seconds after defendant Irwin. Were they in the same car? I don't remember. No, they were not in the same car. Okay. And defendant Gilbreth actually, again, Mr. Ramos, the only information that defendant Irwin had about Mr. Ramos that matched the 911 call that he received is that Mr. Ramos was Hispanic and male. And as we know, in Houston, approximately 45% of people identify as Hispanic. Regardless, defendant Irwin decided to tackle Mr. Ramos, and defendant Gilbreth, who arrived seconds later, who also only saw that Mr. Ramos was Hispanic and male and who perhaps might have had even less information than defendant Irwin in terms of information that might lead to reasonable suspicion, helped defendant Irwin tackle him. I'm sorry to take up all your time. Do you know, in the complaint, does it reflected how long after the 911 call it was that the officers identified Mr. Ramos? I don't know if the complaint reflects that or not. And I'll tell you why I'm asking, because I wrote an opinion about sort of a gang sweep in Corpus Christi where the only information that the officers had was, well, there was a Hispanic man riding a bike. And I wrote an opinion saying that wasn't enough to support a Terry stop. And I'm trying to get at whether this case is similar to or distinguishable from that one. Yes, Your Honor. This case is similar to, I believe you're citing United States v. Alvarez. You're right. Yes. In United States v. Alvarez, there is a description of a plaintiff who is a Hispanic male with large handlebars riding up Leopard and up River. So they give a specific location. And the plaintiff in that case matched that description. And this case, this court found that there was no reasonable suspicion for even a Terry stop in that case. And Mr. Ramos' case has a less specific description than the description in Alvarez, because the only description in Mr. Ramos' case is Hispanic, male, and drunk. There's no tattoos. There's no body size. Yes, I get that. But the difference is that here there was a 911 call that the officers were responding to, whereas in Alvarez it was just sort of a general bulletin. Hey, we once saw a Hispanic guy on a bike, which was like not specific at all. Again, Your Honor, nobody affirmatively identified Mr. Ramos in this case. The 911 caller simply said there's a Hispanic male fighting with a Hispanic female. They're both drunk. There was no affirmative identification. There was no provision of a geographic location, none of that. And again, the 911 caller did not give any other descriptors such as height, build, clothing, hairstyle, tattoos, hair color. Again, 45 percent of people in the city of Houston identify as Hispanic. And to put an even finer point on it, Hispanic is not a race. It is an ethnicity. And there are Hispanic people who have dark skin, Hispanic people who have light skin. And so Hispanic male is definitely not enough for reasonable suspicion. This court has found that several times in United States v. Alvarez, also in Goodson, also in Jones, also in Rios, where there were descriptions that were actually more specific, again, than the description in Mr. Ramos' case. And this court found that there was no reasonable suspicion to stop those suspects. Ms. Martin places a great deal of emphasis on the Espinel case. She mentioned it more than once. And you do helpfully respond to that in your brief. Would you elaborate on that for us as to you say that Espinel is distinguishable? Just explain to us why. And again, I appreciate your doing so in your brief. Yes, Your Honor. So Espinel, the appellants cite Espinel for their notion that the independent intermediary doctrine applies here. And the independent intermediary doctrine does not apply to Mr. Ramos' case because Mr. Ramos' probable cause statements, indictments, and conviction are all for post-arrest conduct. No independent intermediary ever found probable cause to arrest Mr. Ramos in the first instance. So there would be no tension between a finding that officers falsely arrested Mr. Ramos, and then later in the night, Mr. Ramos committed a crime. Espinel is distinguishable from Mr. Ramos' case because the plaintiff in Espinel was indicted and arrested on conduct that took place prior to arrest. And in fact, all of the cases that defendants cite for the independent intermediary doctrine have plaintiffs or suspects who were arrested and indicted for pre-arrest conduct. Here, Mr. Ramos was indicted on post-arrest conduct, and post-arrest conduct cannot justify an arrest in the first instance. The only information that officers had in the first instance were that Mr. Ramos was Hispanic and that Mr. Ramos was male. Mr. Ramos displayed no suspicious, oppositional, or defiant behavior before officers tackled and arrested him. In fact, Defendant Irwin asked Mr. Ramos to tell his side of the story. Mr. Ramos remained silent. Seconds later, Defendant Irwin ordered Mr. Ramos to stop. Mr. Ramos complied with that order. Defendant Irwin radioed Mr. Ramos' compliance back to dispatch, and despite Mr. Ramos being fully compliant and despite officers only having a bare-bones description of the suspect, Defendants Irwin and Gilbert tackled Mr. Ramos to the ground anyway and placed him in handcuffs. Your Honor, I would also like to address something that the appellant said a few minutes ago about whether this is a Terry stop or an arrest, and I want to turn the Court's attention to Lincoln v. Turner, in which this Court found that a Terry stop can convert into an arrest when officers use force and when officers apply handcuffs. That's not always the case. A Terry stop does not always become an arrest when those two things happen, but those two things did happen in Mr. Ramos' case. And additionally, back to the cases I was citing earlier about reasonable suspicion, Alvarez, Rios, Goodson, Jones, in those cases, the Court found no reasonable suspicion to stop those plaintiffs in cases that had more specific descriptions than Mr. Ramos' So even if the Court finds this was a Terry stop, there was not reasonable suspicion and therefore not the higher bar of probable cause to stop Mr. Ramos in the first instance. I would like to address the hog-tying that Defendant Appellants subjected Mr. Ramos to. So before Mr. Ramos was hog-tied, Defendants Irwin and Gilbreth had tackled him, sat on him, and handcuffed him. At some point in the night, the Defendants placed a spit mask on Mr. Ramos' face, and then the Defendant Appellants picked Mr. Ramos up and put him into a police car. At this point, there were about 11 officers on the scene. So Mr. Ramos was fully under the officers' control under three levels of restraint, handcuffs, a spit mask, and a police car. Despite being fully in the officers' control, despite being physically subdued by the officers under three levels of restraint, and despite officers stating on the scene and in post-arrest reports that they believed Mr. Ramos was medically vulnerable, Defendants Doggo, Smith, and Morrison pulled Mr. Ramos back out of the police car, laid him on his stomach on the concrete, and contorted his wrists and his ankles behind him to hog-tie him so that only the front of his torso was touching the ground. Mr. Ramos pleaded significant injuries for this behavior, including restricted and labored breathing and severe bruising, for which medical professionals hospitalized him, as well as psychological trauma. This court has found in Gutierrez, which was decided over 25 years ago, in Good v. Baggett, and also in Aguilar v. City of San Antonio, that hog-tying a medically vulnerable person who is already under the officers' physical control violates clearly established law. What do you mean by medically vulnerable as it applies to the record that we have here? Yes, Your Honor. So specifically, this court has found that hog-tying a drug-affected person who is already restrained physically by the officers violates clearly established law, and that was found in Gutierrez, Aguirre, and also in Good v. Baggett. And in this case, the judges made statements on the scene and in their post-arrest reports and in their probable cause statements that they attached that they believed that Mr. Ramos was under the influence of some unknown drug. And Judge Ellison found in his well-reasoned lower court decision that Gutierrez, Good, and Aguirre, quote, Gutierrez, Good, and Aguirre, each standing alone, could have supplied defendant appellants with fair notice that their conduct was unconstitutional. But together, the three cases uncontrovertibly provided such notice. So whether you can handcuff or hog-tie a person depends on whether he or she is under the influence of some drug or alcohol, is that right? That's counterintuitive. It seems to me that if a suspect is under the influence, then he or she is constitutionally free from being hog-tied. Is that the way? I don't understand that. Yes, Your Honor. So this court has found, again, in Gutierrez, Good, and Aguirre, that hog-tying a drug-affected person violates clearly established law because the risk for heightened injury and the risk of death are much higher for medical reasons when a person is under the influence of drugs. So the person is under the influence of drugs and is acting wildly in a hypothetical case, but if they know that the person is under the influence, then they can't touch him or her? Is that the way it works? I just don't understand that. It seems to me you're digging a hole for yourself if you tell us that that's the law. Yes, Your Honor. The law clearly established in Gutierrez, Aguirre, and Good that hog-tying a drug-affected person violates clearly established law. And, for example, to get into the facts of Gutierrez, officers, much like the officers in Mr. Ramos's case, believed that Mr. Gutierrez was under the influence of drugs and Mr. Gutierrez was behaving erratically and officers hog-tied him due to his erratic behavior, and this court found that it was unconstitutional for – it clearly established that it was unconstitutional to hog-tie Mr. Gutierrez in that instance. And then in Good – So what should the officers do in that kind of a situation? Again, it's hypothetical. What should the officers do? Well, Your Honor, in Mr. Ramos's case, again, he was under three levels of restraint already. He was handcuffed, he was placed in a cop car, and he had a spit mask on him, and there were 11 officers on the scene. And as Mr. Ramos pleaded, he was completely under the officers' control. He did not provide any threat to the officers. And, in fact, this court – You've pled all that, right? Yes. All the things you just said. So do you really need to get into – do you need a medically vulnerable aspect to this to win this appeal? Do we really need to get into that, whether he was medically vulnerable and how does that impact the analysis? No, Your Honor. We don't need to get into that because it's in – exactly like you said, it's in the pleadings and – Well, you've pled that he was restrained and there were 11 officers around. Right, and I – There was no need to hog-tie him, whether or not he was medically vulnerable. Right. And I also – Mr. Ramos also pleaded that officers stated on the scene that they believed he was medically vulnerable. In fact, Officer Irwin stated that he thought Mr. Ramos might be overdosing on something. Right, but I shared some of Judge Smith's concerns that that fact or that allegation sort of – I'm not sure what to do with it because I could see how if someone's medically vulnerable, you don't do that. But if someone's medically vulnerable in a different way, then you have to do that because it presents a danger to himself or others. I just don't know. I don't know if that has anything to do with this case. Yes. Well, Your Honor, like you said, again, Mr. Ramos was under three levels of restraint, fully under the officer's control, so there was no need to hog-tie him, whether he was medically vulnerable or not. And what ended up to be the total number of officers that were out there? Approximately 11 officers on the scene. But it's one guy. But there's one person, Mr. Ramos, yes. What time of day was this? This was early in the morning, around midnight, 1 a.m. And Mr. Ramos, to be clear, back to the independent intermediary doctrine arguments, the Espinal arguments, Mr. Ramos never received any charges relating to the underlying 911 call about the alleged assault. He never received any charges, any indictments, any convictions related to that underlying 911 call. All of that information, charges, probable cause statements, et cetera, were related to post-arrest conduct. And officers, again, fully restrained Mr. Ramos with a spit mask, with a cop car, with the handcuffs before they hog-tied him. I have about two minutes left, so I want to address one more argument that defendant appellants raised about qualified immunity. This court has decided in both Kalina and Hampton that at a 12B6 level, the standard in determining qualified immunity, the court also must accept the allegations of the plaintiff's complaint as true. That's in Kalina v. Fletcher, and that's in Lampton v. Diaz. So the court is accepting the plaintiff's allegations as true, both for the 12B6 determination and for the qualified immunity determination as well. There is not any tension, as the defendants suggested. So, in conclusion, Your Honors, unless you have additional questions, Judge Ellison correctly found that this court has clearly established three uncontroversial principles. One, that race and sex alone do not create reasonable suspicion, let alone probable cause to arrest or use force on a person. Two, that it is unconstitutional to hog-tie a person who is already restrained and who officers believe is medically vulnerable. And three, it is unconstitutional to immediately resort to overwhelming force when apprehending a compliance suspect. Judge Ellison was correct in finding that defendant appellants are not entitled to qualified immunity and that Mr. Ramos' case should not be dismissed under Rule 12B6. Thank you. Thank you, Ms. Duggins. Ms. Martin? Ms. Martin, Ms. Duggins has told us that Mr. Ramos, she used the word compliant, and she also points out, as Judge Ellison's opinion said, that Mr. Ramos stopped when commanded to do so. I thought you had told us something to the contrary earlier, that he ignored or refused the command to stop. Would you address that broad question about compliance and whether he stopped when he was told to? Sure. At first, when he saw the marked unit, he fled. So we know that from the probable cause findings that were attached to R12B6. Fled, meaning walk away or ran away?  He took off running. Takes off is the word that was in the probable cause finding. So then we have the encounter, hey, man, tell us your side of the story. Ramos doesn't comply and keeps walking, does not respond. And then at that point, then Erwin gets out of his marked unit and says, you know, stop. And that's the point at which he complies. So that sounds like what you're saying is contradicts the complaint. Yes. Except it's in the complaint, and that's the thing. I don't know whether it's – I'm not – I'm reading the fact findings here or the factual recital. I don't see that in the complaint. I'm not saying it didn't happen because I don't know. But we're on 12B6. So what's your best case for the proposition that we can consider a probable cause report at 12B6 that contradicts the allegations in the complaint? Well, any judicially noticed facts are right for review on the 12B6. And that's what the probable cause findings are. They're judicially noticeable facts. They're certified copies of these findings. It's contrary to the notion of 12B6. I mean, Jimmy Cricket, you know, it's the complaint. I still say you are making a good argument on the summary judgment. But, I mean, you can't have it both ways. I mean, you – I don't mean you personally. It may be correct, but we've got the complaint. We're at 12B. I mean, it can't be 12B+. Well, this Court's precedent has said you can do a 12B+, but on top of that, if we look at the – We've probably said a lot of stuff anyway. And you're always right. I don't say that. You know, we meet three times a year to straighten out stuff that we say, but that's not here. But the point is that, you know, on this, and we're trying to hone in on exactly this one. I mean, both sides can cite all kind of cases. But as for here, you just seem to be veering away from the unalterable notion of looking at the complaint. Yes, you know, a smidgen here, but most of your argument just seems to be so much about the contested facts. Well, the fact that they pled is that when Irwin asked for your side of the story, Ramos did not comply. That is a fact in their complaint that they pled and then ran from in their calibration. It's not unconstitutional to run away from police officers. Well, when the officer is responding to a 911 call about an assault, at least you've got reasonable suspicion that he's not complying to stop him and put him in handcuffs for officer safety. Now, I want to move on to the hog tying real quick because Judge Ellison's order. I want to ask you about the Espinal opinion, and you heard my dialogue with Ms. Duggans, and she responded in her brief and said that Espinal is distinguishable. You did not make any response to that in your reply brief. So the opportunity is now. What is your response to the distinction drawn for Espinal? Well, the distinction, I mean, Espinal is somewhat factually distinct, but the propositions of case law that this court established in Espinal are completely applicable. If you have probable cause determined after the fact, a false arrest claim fails. Now, if plaintiff had wanted to begin and assert a claim for an unreasonable seizure for a Terry stop without reasonable suspicion, that would have been a separate claim. They didn't plead that claim. Instead, they're trying to merge it into a false arrest claim, but that comes with the learned intermediary doctrine. We have six probable cause findings. A false arrest claim cannot survive on these facts because, let's face it, Mr. Rommers was ultimately convicted, beyond a reasonable doubt, for one of the charges that he was actually arrested for that night. I've run out of— Your view is—you may have already said this, but your view is that he was arrested at what point? Arrested as a matter of law at what point? When he spit on Gilbreth, and what Rommers said in their brief at page three is that Rommers spit on Gilbreth when she was sitting on top of him and before Irwin put the handcuffs on. So that's what he was convicted of. That's what he was ultimately arrested for. Anything before that was simply a Terry stop. All right. Thank you. Thank you. Your case is under submission. That's the case for today, Lee v. Clay County.